United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CRESCENT RESOURCES, LLC,

Plaintiff,

v.

SHELTER SYSTEMS USA, INC., et al.,

Defendants.

Case No. 5:24-cv-02719-EKL

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND DAUBERT MOTIONS**

Re: Dkt. Nos. 73, 76, 77, 78

This case involves the registration and alleged infringement of two trade dresses for octagon-shaped emergency tents sold to governmental entities. Plaintiff Crescent Resources, LLC ("Plaintiff" or "Crescent") asserts that Defendants Shelter Systems USA Inc. ("Systems USA") and Cobalt Equipment, Inc. ("Cobalt") (collectively, "Defendants") infringed Plaintiff's trade dresses by selling a similar shelter to a federal agency in 2023. In their counterclaim, Defendants seek to cancel Plaintiff's trademark registrations on two separate bases: (1) alleged fraud by Plaintiff on the U.S. Patent and Trademark Office ("USPTO") when applying for trademark registrations in 2020, and (2) the tent designs' ineligibility for trademark protection due to their alleged functionality.

Before the Court are cross-motions for summary judgment and two related *Daubert* motions. The Court carefully reviewed the briefs, the complete summary judgment record, and the relevant authorities, and heard argument on April 9, 2026. For the following reasons, the Court GRANTS Defendants' motion for summary judgment on their counterclaim for cancellation of the registrations based on the functionality of the trade dresses. This ruling is dispositive of Plaintiff's Lanham Act and state law claims. Accordingly, the Court DENIES Plaintiff's motion for summary judgment. The Court DENIES in part and GRANTS in part Plaintiff's motion to

exclude the expert testimony of Robert Corser. The Court TERMINATES as moot Defendants' motion to exclude the expert testimony of Joel Delman.

# I. BACKGROUND

## A. Factual Background[1]

### 1. Plaintiff's Predecessor Western Shelter Systems is Founded

Plaintiff and its predecessors have been in the business of designing, building, and selling tents, shelter systems, and field support systems for over thirty years. Compl. ¶ 9, ECF No. 1. Plaintiff sells shelters through direct interactions with government agencies and procurement officers. DAF 26. Plaintiff's predecessor, Western Shelter Systems ("Western Shelter"), was founded in 1988 by Paul Bennett as a d/b/a of his company, A.W. Bennett Enterprises. DF 1. Western Shelter and its successor entity, Western Shelter Acquisitions ("WSA"), were twice sold to private equity firms, DF 2, 4, before WSA's assets were acquired by Plaintiff in 2025, DAF 2.

Shortly after its founding in 1988, Western Shelter entered into a distributor agreement with a Canadian company, Design Shelter, Inc. ("Design Shelter"). DF 1. Pursuant to the distributor agreement, Western Shelter licensed the right to sell and distribute two shelters that Design Shelter had designed. *Id.* One of the two shelters was in the form of a 20-foot octagon, and was eventually given the trade name "GK20." DF 7. The other shelter was in the form of a 19-by-35-foot elongated octagon, and was eventually given the trade name "GK1935." *Id.* In or around July 1996, Western Shelter obtained the right to *manufacture* and sell the two shelters. DF 1. These two shelters and the later acquired trademark registrations are at the heart of this case.

[1] Unless otherwise noted, the material facts cited in this Order are undisputed for purposes of the cross-motions. *See* Pl. Reply Separate Statement Supp. Summ. J. Mot., ECF No. 84-6; Defendants' Reply Separate Statement of Undisputed Material Facts, ECF No. 85-1. References to "DF" and "DAF" are material facts offered by Defendants from Defendants and Plaintiff's statements of material facts, respectively. References to "PF" and "PAF" are material facts offered by Plaintiff from Plaintiff and Defendants' statements of material facts, respectively. To the extent a party objects to evidence but concedes that the facts are undisputed, the objections are not material. The Court considers each party's expert reports as part of the factual record, except for the portions excluded for the reasons articulated in Section III.

### 2. WSA Applies for Trademark Registration for the Trade Dresses

Pursuant to the distribution agreement with Design Shelter, Western Shelter and its successors sold the GK20 and GK1935 shelters for over 30 years. DF 7. During that time, the GK20 and GK1935's "basic shape and design" did not change.[2] *Id.* Then on May 18, 2020, WSA submitted applications to the USPTO to register trademarks for the two shelters.[3] DF 9. In the applications, the GK20 and GK1935 were both described as a "trade dress consisting of a three-dimensional temporary building that has an octagonal shape when viewed from above." DX1 at WSA_00090; DX2 at WSA_00225.

On August 20, 2020, the USPTO issued a non-final office action rejecting both trademark applications on numerous grounds, including functionality and distinctiveness. DF 10; DX 1 at WSA_00037; DX 2 at WSA_000141. As to functionality, the examiner cited to Plaintiff's advertising that "extol[led] the utilitarian advantages [of] the products." DX 1 at WSA_00038; DX 2 at WSA_000142. As to distinctiveness, the examiner "attached third party webpages" showing similar designs. DX 1 at WSA_00039; DX 2 at WSA_000142. The examiner required WSA to provide more "information and documentation" about the proposed trade dresses' functionality, including advertising relating to their design features, alternative designs available for the design features, and any other evidence relevant to registrability. DX 1 at WSA_00039, DX 2 at WSA_00143. The examiner also concluded that both applications failed to "include a

[2] It is undisputed that these shelters have the shape and design since 1988. Plaintiff disputes "whether [Western Shelter] has used the same model/part numbers since 1988," DF 7, but that dispute is not material.

[3] The parties dispute whether Western Shelter or WSA was the trademark applicant. DF 9. The Court refers to the trademark applicant as WSA for purposes of describing the trademark application history. DX1 at WSA_00012, ECF No. 78-2; DX2 at WSA_0000112, ECF No. 78-3.

Citations to "DX" exhibit numbers refer to Defendants' exhibits attached to the Declarations of Joshua Bornstein (ECF Nos. 78-1, 85-1), Rob Knabe (ECF No. 78-47), and Roxann Kasparian (ECF No. 78-51). Similarly, citations to "MSJ PX" and "Opp. PX" exhibit numbers refer to Plaintiff's exhibits attached to the Declarations of Darius C. Gambino (ECF No. 73-1) and Irfan Hassam-Malani (ECF No. 84-1), respectively. Citations to "Corser PX" exhibit number refer to Plaintiff's exhibits attached to the Declaration of Irfan Hassam-Malani in support of Plaintiff's motion to exclude Corser's testimony (ECF No. 76-1).

sufficient description of the mark." DX 1 at WSA_00040; DX 2 at WSA_00144. The examiner then suggested trade dress descriptions for the GK20 and GK1935. DX 1 at WSA_00040; DX 2 at WSA_00144.

On October 21 and 26, 2020, WSA submitted responses to the non-final office action. DF 11. WSA substantially adopted the examiner's proposed descriptions for the GK20 and GK1935. DX 1 at WSA_00021; DX 2 at WSA_00122. WSA also submitted two declarations from its president and CEO, Michael Scala. DF 3, 11. In the declarations, Scala made the following statements, among others:

> 1) The [GK20 / GK1935] Trade Dress has become distinctive of the goods that it is used in connection with (i.e. portable structures) through [Western Shelter's] substantially exclusive and continuous use in commerce for over thirty (30) years.
>
> 2) The [GK20 / GK1935] Trade Dress was chosen by [Western Shelter] solely for aesthetic reasons.
>
> 3) The [GK20 / GK1935] Trade Dress confers no functional benefits that cannot be achieved using alternative shapes.
>
> 4) The [GK20 / GK1935] Trade Dress is not the result of a simple or inexpensive method of manufacture in relation to alternative designs.
>
> 5) To WSA's knowledge, no other company makes a portable structure that has an octagonal shape when viewed from above.
>
> 6) The [GK20 / GK1935] Trade Dress is not the result of a simple or inexpensive method of manufacture in relation to alternative designs for portable structures.
>
> 7) WSA's advertising and marketing materials do not tout any utilitarian advantages of the [GK20 / GK1935] Trade Dress.

DF 11.

### 3. The USPTO Issues Trademark Registrations for the GK20 and GK1935

Less than four months after Scala's declarations were submitted, the USPTO issued trademark registrations for both the GK20 and the GK1935 ("Trade Dresses") on February 16, 2021. PF 1, 2; DF 25, 26. The GK20 is registered as U.S. Reg. No. 6,270,091 ("GK20 Trade Dress"). DF 25. The GK1935 is registered as U.S. Reg. No. 6,270,092 ("GK1935 Trade Dress").

DF 26.

The GK20 Trade Dress is described in its registration as follows:

> [The GK20 Trade Dress] consists of a three-dimensional configuration of a temporary building that has an octagonal shaped roof. The roof is formed of eight triangular shaped panels that come together at a circular member in the center of the roof. The building has eight rectangular shaped sidewalls that together also form an octagon. Every other sidewall includes a rectangular window. The building has a rectangular shaped double door and a bottom rectangular threshold.

DF 25.

The design of the GK20 Trade Dress, as represented in its registration, is reproduced below.



PX A at 2, ECF No. 73-2.

The GK1935 Trade Dress is described in its registration as:

> [The GK1935 Trade Dress] consists of a three-dimensional configuration of a temporary building that has an elongated octagonal shaped roof. The roof is formed of three triangular shaped panels on each side that come together at circular members on opposite ends of the roof. The building has eight rectangular shaped sidewalls that together also form an elongated octagon. Every sidewall includes a rectangular window. The building has a rectangular shaped double door and a bottom rectangular threshold.

DF 26.

The design of the GK1935 Trade Dress, as represented in its registration, is reproduced below.



PX B at 2, ECF No. 73-3.

The final descriptions in both registrations are substantially similar to the descriptions proposed by the USPTO examining attorney and adopted by WSA, with minor changes. *Compare* DX 1 at WSA_00040 (examiner proposes "a temporary building that has an octagonal shaped roof lifting to a circular center pole"), *with* DF 25 (registration states that trade dress "consists . . . of a temporary building that has an octagonal shaped roof"); *compare* DX 2 at WSA_00144 (examiner proposes "[t]he building also has a rectangular shaped double door at one end"), *with* DF 26 (registration states "[t]he building has a rectangular shaped double door").

**4. Cobalt Sells a BASE-8 Shelter**

Defendant Cobalt has been in the emergency and disaster response business since 2004. Knabe Decl. ¶ 2. As with Plaintiff, Defendants Cobalt and Systems USA sell shelters through direct interactions with government agencies and procurement officers. DAF 26. Systems USA was formed in 2022 to manufacture two shelters designed by Cobalt: the BASE-8 (a 20' polygon shelter) and BASE-12 (a 19' x 35' polygon shelter).[4] Knabe Decl. ¶¶ 14, 15. It is undisputed that

[4] The parties dispute when and why Defendants began designing and manufacturing the BASE-8 and BASE-12 tents. These disputes include whether and when Cobalt purchased Wester Shelter tents in 2016 prior to registration of the Trade Dresses; when Cobalt purchased tents from a third-party competitor; and Defendants' motivation to design and develop its own octagonal tents. *See* Knabe Decl. ¶¶ 5-14; PF 11. These factual disputes relate to either distinctiveness or the likelihood of confusion, which the Court does not address because of its conclusion that the Trade Dresses are functional. Similarly, the Court does not address Defendants' objection to Exhibit L, ECF No. 73-13.

the BASE-8 and BASE-12 shelters are similar in appearance, respectively, to the GK20 and GK1935 shelters. PF 13, 14. The parties' respective products are shown below.

| GK20, Compl. ¶ 13. | GK1935, Compl. ¶ 30. |
|---|---|
|  |  |
| BASE-8 tent, Compl. Ex. 3 at 9, ECF No. 1-4.[5] | BASE-12 tent, Compl. Ex. 3 at 8. |
|  |  |

In September 2023, the U.S. Department of Agriculture, Forest Service ("Forest Service") published a solicitation for an octagonal shelter (20' x 20' x 6') for a ranger station. DAF 18, 21. Defendant Cobalt responded to the solicitation and was awarded the contract. DAF 22. Later that month, a single BASE-8 shelter was sold to the Forest Service. Kasparian Decl. ¶¶ 12-13.

### B. Procedural History

Plaintiff's predecessor, WSA, filed a complaint in the U.S. District Court for the District of Oregon on February 8, 2024, asserting claims for (1) trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition by false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) unfair competition under Oregon common law; (4) violations of Oregon's Unlawful Trade Practices Act ("UTPA"), Or. Rev. Stat. § 646.605 *et seq.*; and (5) unjust enrichment.[6] Compl. ¶¶ 69-129. On May 7, 2024, the case was

[5] All exhibit page numbers refer to the ECF page numbers.

[6] On September 29, 2025, the Court granted the parties' joint stipulation to substitute Plaintiff, in place of WSA as Plaintiff and Counterclaim-Defendant. Order Granting J. Stip. to Substitute, ECF No. 70.

United States District Court
Northern District of California

transferred to the Northern District of California. ECF No. 12.

On June 14, 2024, Defendants filed an answer and counterclaim. ECF Nos. 21, 22. Defendants subsequently filed their first amended counterclaim seeking: (1) cancellation of the Trade Dresses' registrations based on fraud on the USPTO; (2) cancellation of the Trade Dresses' registrations for lack of distinctiveness; (3) cancellation of the Trade Dresses' registrations due to the designs' functionality; (4) a declaration that Defendants were not infringing on the Trade Dresses; and (5) relief for Plaintiff's fraud in obtaining the Trade Dresses' registrations. Am. Countercl. ¶¶ 39-73, ECF No. 40.

On December 19, 2025, Plaintiff filed its motion for summary judgment as to its claims for trademark infringement and unfair competition under the Lanham Act. Pl. Mot. Summ. J. at 1, ECF No. 73 ("Pl. MSJ"). Additionally, Plaintiff filed a motion to exclude the testimony of Defendants' expert, Robert Corser. Mot. to Exclude Corser, ECF No. 76 ("Corser Mot."). On January 14, 2026, Defendants filed their motion for summary judgment, requesting summary judgment on their counterclaims for cancellation of the Trade Dresses' registrations on the basis of functionality and fraud on the USPTO. Defs. Notice of MSJ at 2, ECF No. 78 ("Defs MSJ Notice"). Defendants also requested dismissal with prejudice of all five of Plaintiff's claims.[7] *Id.* Additionally, Defendants filed a motion to exclude the testimony of Plaintiff's expert, Joel Delman. Mot. to Exclude Joel Delman, ECF No. 77 ("Delman Mot.").

The Court heard argument on the motions on April 9, 2026. Min. Entry, ECF No. 90. On May 8, 2026, the Court requested supplemental briefing on the following questions: (1) whether the outcome of Plaintiff's unfair competition under the Lanham Act is determinative of its claim of unfair competition under Oregon common law; (2) whether Plaintiff has standing to bring a claim under Oregon's Unfair Trade Practices Act; and (3) whether unjust enrichment under Oregon law is solely a remedy and not a claim. Suppl. Br. Order, ECF No. 91. The parties timely

[7] Defendants also seek "summary adjudication in their favor based on Plaintiff's failure to meet its burden establishing 'likelihood of confusion,'" required for its first four claims (*i.e.,* federal trademark infringement, federal false designation, state common law unfair competition, and state unlawful trade practices). *Id.*

United States District Court
Northern District of California

filed supplemental briefs and responses. Defs. Suppl. Br., ECF No. 95; Pl. Suppl. Br., ECF No. 96; Reply to Pl. Suppl. Br., ECF No. 99; Reply to Defs. Suppl. Br., ECF No. 100.

## II. MOTIONS FOR SUMMARY JUDGMENT

The Court first addresses the parties' cross-motions for summary judgment, beginning with Defendants' motion for summary judgment, followed by Plaintiff' motion for summary judgment. The Court then addresses the parties' related *Daubert* motions in the following section.

### A. Legal Standard

A court may grant summary judgment on any issue, claim, or defense if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may satisfy this burden in different ways depending on whether it has the burden of proof at trial. If the moving party bears the burden of proof at trial, it must cite to "particular parts of materials in the record" to demonstrate that no reasonable trier of fact could find for the non-moving party. Fed. R. Civ. P. 56(c)(1)(A). By contrast, if the non-moving party bears the burden of proof at trial, the moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has met its burden, the burden shifts to the non-moving party to designate specific facts showing that there is a genuine dispute. *Celotex*, 477 U.S. at 324. To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to survive summary judgment. *Anderson*, 477 U.S. at 252. Instead, "there must be evidence on which the jury could reasonably find for the [non-moving

party]." *Id.*

In determining whether there is a genuine dispute of material fact, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). The court does not "engage in credibility determinations or weigh evidence." *Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment is warranted. *Matsushita*, 475 U.S. at 587 (citation modified). While trademark law is fact-dependent and often not conducive to resolution on summary judgment, summary judgment is appropriate "when no dispute remains as to genuine issues of material fact." *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1108 (N.D. Cal. 2008) (citing *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n,* 465 F.3d 1102 (9th Cir. 2006)).

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). At summary judgment, the focus is not "on the admissibility of the evidence's form," but rather "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule[] of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001).

**B. Defendants' Motion for Summary Judgment**

The Court addresses the issues raised in Defendants' motion for summary judgment in the following order. First, the Court considers Defendants' counterclaim for trademark cancellation on the basis of fraud on the USPTO and finds that there remains a genuine issue of material fact. Second, the Court considers Defendants' counterclaim for trademark cancellation on the basis of functionality. The Court finds that Defendants are entitled to summary judgment on this counterclaim because no reasonable trier of fact could find that the Trade Dresses are non-

functional. Third, because the Trade Dresses are functional as a matter of law, Defendants are entitled to summary judgment on Plaintiff's claims under the Lanham Act for trademark infringement and unfair competition. Finally, the Court concludes that because Plaintiff's state law claims fail for the same reasons as the Lanham Act, Defendants are entitled to summary judgment on those claims as well.

**1. Trademark Cancellation Pursuant to 15 U.S.C. § 1119**

Defendants move for summary judgment on their counterclaims seeking cancellation of the Trade Dresses' registrations based on fraud on the USPTO and on functionality. *See* 15 U.S.C. § 1119. "To be valid and protectable, a mark must be distinctive and non-functional." *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1022 (9th Cir. 2018). The Lanham Act imposes a presumption of functionality for unregistered trade dress, and plaintiffs normally bear the burden of proof for non-functionality. 15 U.S.C. § 1125(a)(3); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001). Where the trade dress or mark is federally registered, it benefits from a presumption of validity that may only be rebutted "by a preponderance of the evidence that the mark is not protectable." *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114 (9th Cir. 2010) (first citing *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002); and then citing *Vuitton Et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 775-76 (9th Cir. 1981)).

Cancellation of a trademark registration "is proper when (1) there is a valid ground why the trademark should not continue to be registered and (2) the party petitioning for cancellation has standing." *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 348 (9th Cir. 1984) (quote marks omitted) (quoting *Int'l Order of Job's Daughters v. Lindeburg & Co.,* 727 F.2d 1087, 1091 (Fed. Cir. 1984)). Because standing is not disputed, the only question is whether there is a valid ground for cancellation.[8] A registered mark may be cancelled if it is functional, has been

[8] It is undisputed that Defendants have standing to seek cancellation. "Being sued for trademark infringement is sufficient injury to confer standing to seek cancellation of a mark." *WM Int'l, Inc. v. Golden Lyon Inv. Co.*, No. 20-cv-00995, 2020 WL 6826485, at *2 (C.D. Cal. Nov. 5, 2020) (collecting cases).

United States District Court
Northern District of California

abandoned, "or its registration was obtained fraudulently," among other reasons. 15 U.S.C. § 1064(3).

A defendant bears the burden of proof to show that the trade dress registrations are invalid, whether because of fraud on the USPTO or due to functionality. *See Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (fraud on USPTO); *W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 1128 (Fed. Cir. 1994) (burden of proof as to any basis under 15 U.S.C. § 1064). "[I]f a defendant establishes that a mark was obtained through fraud on the [USPTO], the burden shifts back to the plaintiff to establish distinctiveness and non-functionality." *OTR Wheel Eng'g*, 897 F.3d at 1022. If a defendant establishes that a mark is functional, then the trademark registration is invalid and the plaintiff's Lanham Act claims for trademark infringement and unfair competition "cannot survive summary judgment." *Tie Tech*, 296 F.3d at 783.

Here, because the Trade Dresses are registered, Defendants bear the initial burden of proof for their counterclaims *and* for obtaining summary judgment on Plaintiff's claims of trademark infringement and unfair competition. In viewing the evidence in the light most favorable to Plaintiff, the Court finds that Defendants fail to meet the heavy burden to establish that the Trade Dresses' registrations were obtained through fraud. However, the Court concludes that there is no genuine issue of material fact as to the Trade Dresses' functionality and that cancellation of the registrations is warranted.

**a. Cancellation for Fraud on the USPTO**

Defendants assert that the Trade Dresses' registrations were issued based on false representations to the USPTO. Defs. Summ. J. Mot. at 12-15, ECF No. 78 ("Defs. MSJ"). To cancel a registered mark for fraud on the USPTO, the movant must establish: "(1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance." *OTR Wheel Eng'g*, 897 F.3d at 1019. Fraud must be established by clear and convincing evidence. *Id.*; *Hokto Kinoko*, 738 F.3d at 1097 (noting that the burden is "heavy").

Defendants argue that Scala's declarations submitted to the USPTO in August 2020 contained four false statements "strategically made" to overcome the USPTO's non-final findings. Defs. MSJ at 12. Specifically, Defendants assert that the following four statements were false: (1) the Trade Dresses' designs were "chosen solely for aesthetic reasons"; (2) the Trade Dresses "confer[] no functional benefits that cannot be achieved using alternative shapes"; (3) Western Shelter's advertising "does not tout any utilitarian advantages"; and (4) "no other company makes a portable structure that has an octagonal shape." *Id.* (quoting DF 11).

To be sure, Defendants have produced substantial evidence demonstrating that these statements were false or lacked a factual basis. However, genuine disputes of material fact remain with respect to Scala's knowledge and whether the USPTO actually and reasonably relied on the misrepresentations. *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1279 (S.D. Cal. 2018) (noting that declarations submitted to the USPTO are "phrased in terms of a subjective belief," so "it is extremely difficult to prove fraud so long as the signer has an honestly held, good faith belief" (citation modified)).

First, the parties dispute what Scala knew when he stated that the Trade Dresses' designs were "chosen solely for aesthetic reasons." Defs. MSJ at 13-14; Pl. Opp. Defs. MSJ & Reply Supp. Pl. MSJ at 19, ECF No. 84 ("Pl. Opp."). Scala's own testimony indicates that he had no knowledge of the Trade Dresses' design process because he joined Western Shelter in 2015 – long after the designs were created – and he did not know who designed the GK20 or why Western Shelter's predecessor company or its CEO chose to sell octagon-shaped shelters. DX 3 174:10-18; 175:22-176:21; 178:14-23; 185:4-12, ECF No. 78-4. Therefore, although the record demonstrates that Scala lacked a factual basis to assert that the Trade Dresses' designs were chosen solely for aesthetic reasons, there is a genuine dispute as to whether Scala knew the statement was unsupported or false. Ultimately, evaluation of Scala's testimony necessarily "depends on the credibility of witnesses." *adidas Am., Inc. v. TRB Acquisitions LLC*, No. 15-cv-02113, 2018 WL 10335661, at *6 (D. Or. Dec. 13, 2018) (citing *Anderson*, 477 U.S. at 255). Thus, the Court finds that the credibility determination is best left to the jury and is "not appropriate to consider at summary judgment." *Id.*

Second, contrary to Scala's representation, Western Shelter's advertising *did* tout the Trade Dresses' utilitarian advantages. Defendants cited two emails sent to and from Scala predating his USPTO declarations. The first email was sent by Scala in July 2015, attaching a brochure for the Trade Dresses. DF 17 (citing DX 19 at WSA_048528, WSA_048532-537, ECF No. 78-20)). The brochure stated that Western Shelter's designs were "based on the geometry of the octagon shape, which inherently delivers more structural integrity than a conventional square or rectangular structure." DX 19 at WSA_048536. The second email was sent to Scala in 2017, from a third party interested in acquiring Western Shelter. DF 14. The email attached a ten-page business acquisition memo, drafted by the third party. DF 2, 14. This was not advertising by Western Shelter. Defendants provide no evidence that Scala reviewed these two attachments before he submitted his declarations to the USPTO. A reasonable fact finder could conclude that Scala was not aware of these statements and thus believed that his USTPO declarations were accurate.[9]

Finally, Defendants argue that Scala knowingly misrepresented to the USPTO that "[t]o WSA's knowledge, no other company makes a portable structure that has an octagonal shape." Defs. MSJ at 12, 14. Plaintiff does not dispute that Scala was aware of Design Shelter and its octagon-shaped shelters at the time of his USPTO declarations, which renders Scala's statement false. *See* Defs. Reply at 6; Pl. Opp. at 20. However, Defendants have not shown that the USPTO *relied* on Scala's statement. In initially rejecting the trademark application, the examiner cited to third-party webpages that included similar designs; three of those webpages included octagonal tents.[10] Because the examiner was already aware of other "portable structure[s]" with "octagonal

---

[9] Perhaps Scala should have reviewed these attachments at the time or before the USPTO application. But whether he should have reviewed the attachments is a different inquiry from whether he knowingly made a false statement. *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009); *Levi Strauss & Co. v. Esprit US Distrib. Ltd.*, 588 F. Supp. 2d 1076, 1084 (N.D. Cal. 2008) (finding that affiant's lack of investigation alone is not a factual basis for finding of deceptive intent); *cf. Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990) (affidavit was fraudulent when declarant admitted that she had knowledge of adverse state court decision at time of declaration).

[10] *See* DX 1 at WSA_00039, WSA_00054, WSA_00068, WSA_00077-081; DX 2 at WSA_00142, WSA_00157, WSA_000170, WSA_00180-83.

shape[s]," a jury could find that the USPTO examiner did not rely on Scala's statement that to WSA's knowledge, there was "no other company mak[ing] a portable structure that [had] an octagonal shape when viewed from above." DF 11; *see, e.g.*, *OTR Wheel Eng'g*, 897 F.3d at 1021 (no reliance by USPTO on alleged fraudulent omission because USPTO was already aware of omitted fact).

The Court concludes that Defendants failed to establish by clear and convincing evidence that the Trade Dresses' registration were issued due to fraud on the USPTO. Thus, the Court denies Defendants' motion for summary judgment as to its counterclaim for cancellation based on fraud.

**b. Cancellation for Functionality**

Defendants next argue that the Trade Dresses' registrations should be cancelled because their designs are functional. A product design has utilitarian functionality if its design is "essential to the use or purpose of the article or if it affects the cost or quality of the article."[11] *TrafFix*, 532 U.S. at 35 (citations omitted). To determine whether a design has utilitarian functionality, the Ninth Circuit considers the four *Disc Golf* factors: "(1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Moldex-Metric, Inc. v. McKeon Prods., Inc.*, 891 F.3d 878, 880 n.2 (9th Cir. 2018) (citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998)).

"[A]s a matter of law, a product's 'overall appearance' is functional, and thus unprotectable, where the whole product is 'nothing other than the assemblage of functional parts,' and 'even the arrangement and combination' of those parts is designed to make the product more functional." *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 866 (9th Cir. 2020) (collecting cases). Thus, reviewing a trade dress that is the product's "overall appearance"

[11] Alternatively, a trademark may be functional if it has aesthetic functionality. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 35 (2001). However, Defendants do not assert that the Trade Dresses have aesthetic functionality, Defs. MSJ at 15, so the Court does not reach that issue.

United States District Court
Northern District of California

requires a court to "examine all of its features, including the ways in which its various parts are combined or arranged, and to recognize that nonfunctional combinations or arrangements of functional parts can create an overall appearance that should be deemed nonfunctional." *Id.* Even if a product's design features have utilitarian functionality, the product's overall appearance is not necessarily functional if there is evidence that the appearance "derive[s] from non-utilitarian design choices." *Id.* at 867. By contrast, if a "product's form follows its utilitarian function" and there is "no evidence of any non-utilitarian design choices," the product's appearance is functional. *Id.* (citation modified).

**i. Utilitarian advantages**

Defendants argue that the first *Disc Golf* factor supports a finding of functionality because the Trade Dresses' designs provide a utilitarian advantage. Keeping in mind the Ninth Circuit's instruction to review trade dresses as a whole, the Court considers whether the Trade Dresses' individual features each provide a utilitarian advantage. Even if those features all yield utilitarian advantages, the Court then considers whether the arrangement of these "functional parts . . . create an overall appearance that should be deemed nonfunctional."[12] *Blumenthal*, 963 F.3d at 866.

To demonstrate that the Trade Dresses provide utilitarian advantages, Defendants submitted the expert report of Robert Corser ("Corser Report"). Defs. MSJ at 15-21; *see* DX 10, ECF No. 78-11 ("Corser Report"). To prepare his opinion, Corser relied on his own research and expertise, and also considered the Trade Dresses' trademark application histories, certain U.S. patents, Design Shelter and Western Shelter's advertisements, and shelters considered to be

[12] Plaintiff asserts that Defendants' analysis "intentionally ignores the distinction between *de facto* functionality and *de jure* functionality." Pl. Opp. at 7-8. A product that is *de jure* functional "is in its particular shape because it works better" in that particular shape. *Tie Tech*, 296 F.3d at 785. If a product is *de jure* functional, it is not entitled to trademark protection. *Id.* On the other hand, a product that is *de facto* functional can qualify for trademark protection; while it is designed to achieve a basic purpose, its appearance may also reflect nonfunctional design choices. *Id.*

Plaintiff cursorily asserts that the Trade Dresses are "comprised [of] a combination of aesthetic elements that do not provide any functional benefits over numerous alternative designs." Pl. Opp. at 8. However, in the face of Defendants' evidence that the Trade Dresses provide utilitarian advantages, Plaintiffs must provide evidence of arbitrary design choices for the Trade Dresses. Plaintiff failed to do so.

competitors to the Trade Dresses. Corser Report ¶¶ 3, 22-34, 62-99, 119-127, 188-207. Corser also conducted mathematical analyses to compare an octagonal shelter's spatial efficiency against that of other shapes. *Id.* ¶¶ 153-160. Corser also used computational fluid dynamics ("CFD") to compare an octagonal shelter's structural stability against that of other shelter shapes. *Id.* ¶¶ 161-186.

The Trade Dresses' registrations listed the following elements, DF 25, 26, and Defendants submitted evidence that each element provides a utilitarian advantage, Defs. MSJ at 15-17.

*Triangular roof panels that converge at a circular member*: The Trade Dresses' roofs are designed as triangular roof panels, arranged in an octagonal shape and converging at circular hubs. DF 25, 26. Corser states that the "spoke-and-hub roof panels converging at [a] circular hub" allows for even weight distribution and ventilation. Corser Report ¶¶ 6, 7. Corser also finds that the roofs' shape also promotes water and snow runoff. Corser Report ¶¶ 6, 7, 108, 223, 224.

*Rectangular sidewalls*: For both Trade Dresses, eight rectangular sidewalls are arranged to form an octagon. DF 25, 26. According to Corser, vertical and rectangular sidewalls are better able to accommodate square or rectangular furniture. Corser Report ¶ 108. They also maximize floorspace, compared to "curved or dome structures" where floor space is lost at the structures' edges. *Id.* ¶¶ 108, 124.

*Rectangular windows*: The Trade Dresses include rectangular windows on every other sidewall. DF 25, 26. Corser explained that the alternating place of the rectangular windows "provide[s] cross ventilation and natural light, while maintaining structural integrity." Corser Report ¶¶ 108, 223, 224.

*Rectangular double doors and threshold*: Both Trade Dresses have rectangular double doors and rectangular thresholds. DF 25, 26. According to Corser, double doors help with ADA compliance and "quick ingress and egress, which is critical in emergency medical settings." Corser Report ¶ 108. Corser asserted that the double doors' rectangular shape helps with access to large equipment and efficiency in ingress and egress. *Id.* ¶¶ 6, 223, 224.

*Octagonal shape*: Both Trade Dresses are described as having "an octagonal shaped roof." DF 25, 26. The vertical sidewalls are also arranged into an octagonal shape. *Id.* Based on his

United States District Court
Northern District of California

CFD models, Corser found that octagonal shelters are more stable than rectangular or square shelters, especially in the face of wind or other weather. Corser Report ¶¶ 116-183. Additionally, Corser observed that octagons are more interoperable compared to shapes with fewer sides, such as squares, rectangles, or circles: an octagonal shelter is unique in allowing for shelters to be connected along the cardinal directions, allowing for more varied complexes. *Id.* ¶¶ 114-115, 187. Corser also found that compared to rectangular or square shelters, an octagonal shelter was relatively "spatially efficient" – it could enclose the same amount of usable space with less materials. *Id.* ¶¶ 151-160.

Defendants' showing of the utilitarian advantages of the trade dresses is undisputed. Rather than providing evidence that the features of its shelters are aesthetic, Plaintiff summarily contends that its tents are not functional and are "a combination of aesthetic elements that do not provide any functional benefits over numerous alternatives." Pl. Opp. at 8. The only evidence that Plaintiff submits is the rebuttal expert report of Winslow Burleson. Opp. PX C, ECF No. 84-4 ("Burleson Report"). In his report, Burleson opines that an octagonal tent design provides no particular functional advantage over other shapes because a shelter with more than eight sides would have more structural stability and spatial efficiency than the Trade Dresses.[13] *Id.* ¶¶ 47, 48, 51, 53.

Burleson's analysis and conclusion are premised on an incorrect understanding of what constitutes a utilitarian advantage. Burleson incorrectly assumes that a product feature that is "not optimized" is an aesthetic choice and thus is non-functional. However, the question is not whether the Trade Dresses have less or more *overall* utility compared to alternatives. *Leatherman Tool Grp., Inc. v. Cooper Indus.*, 199 F.3d 1009, 1014 (9th Cir. 1999) (The notion that "a product feature is nonfunctional if there is *any* alternate design that competes to *any* degree . . . is

[13] Burleson similarly contends that there are minimal differences in spatial efficiency between an eight-sided shelter and a five, six, or seven-sided shelter. Burleson Report ¶ 50. But this critique fails to address other advantages that an octagonal shelter may have, such as the interoperability and ease of organization from an octagon. Corser Report ¶ 187. Trade dress law cannot be used to "compel . . . competitors to resort to alternative designs which have a different set of advantages and disadvantages." *Leatherman*, 199 F.3d at 1014 n.7.

inconsistent with the purpose and extent of the functionality doctrine."). To be considered functional, a product feature does *not* need to have "*superior* utilitarian advantages." *Disc Golf*, 158 F.3d at 1007. It only needs to "have *some* utilitarian advantage to be considered" functional. *Id.* Because the Burleson Report does not contest that the Trade Dresses offer *some* functional advantage, it fails to raise a genuine issue of material fact.

Plaintiff attempts to rely on *Millennium Laboratories, Inc. v. Ameritox, Ltd.,* 817 F.3d 1123, 1130 (9th Cir. 2016). Pl. Opp. at 9-10. In *Millenium*, the Ninth Circuit reversed the district court's denial of summary judgment because there remained a genuine issue of material fact as to whether Millennium's product, a graphical format for presenting data, was functional. *See* 817 F.3d at 1129. Plaintiff asserts that like in *Millennium*, there are serious questions as to whether "one or more of the elements of the design were aesthetic in nature." Pl. Opp. at 10. However, in *Millennium*, the plaintiff introduced evidence that specific design choices were made for aesthetic purposes, specifically that its marketing department and graphic designers had created the product to be "presentable" and to "distinguish Millenium from its competitors." *Millenium*, 817 F.3d at 1130 (citation modified). Here, Plaintiff has not introduced any evidence indicating that Plaintiff's shelters and their features were designed for aesthetic purposes.[14] *See Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 677, 688 (9th Cir. 2012) (no issue of fact about trade dress's functionality in part because there was no "evidence, like engineering notebooks or testimony from the designers, about design or aesthetics"); *cf. Clicks Billiards*, 251 F.3d at 1261-62 (issue of fact as to functionality because of evidence that pool hall's appearance was motivated by "decorative and aesthetic" reasons, rather than cost effectiveness or efficiency).

In sum, "[e]xcept for conclusory, self-serving statements, [Plaintiff] provides no other evidence of fanciful design or arbitrariness; instead, here, 'the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance.'" *Secalt* at 684 (citing *Leatherman*, 199 F.3d at 1013).

---

[14] In fact, the evidence in the record, such as Western Shelter and Design Shelter's prior advertisements indicate that the features were for functional purposes. *See infra* Section II.B.1.b.i.

United States District Court
Northern District of California

Accordingly, this factor weighs in favor of a finding of functionality.

**ii. Alternative designs**

Defendants argue that the second *Disc Golf* factor supports a finding of functionality because the Trade Dresses provide unique advantages that cannot be obtained through other designs. Defs. MSJ at 18-19. "[A] lack of alternative designs favors a finding of functionality." *Secalt*, 668 F.3d at 686. The existence of "alternative designs cannot negate a trademark's functionality," but may "indicate whether the trademark itself embodies functional or merely ornamental aspects of the product." *Moldex-Metric*, 891 F.3d at 884-85 (citation omitted). A trade dress is more likely to be found non-functional if the alternative designs can also achieve the trade dress's functional advantages, because "competitors would not be unreasonably limited" in their design options. *Blumenthal*, 963 F.3d at 868. An alternative design cannot be "merely theoretical or speculative"; it must be "commercially feasible." *Disc Golf*, 158 F.3d at 1008. Commercial viability may be demonstrated through sales data and market shares. *Id.* at 1009.

Defendants present substantial evidence that while there are alternative designs that may be "highly functional and useful," they do "not offer exactly the same features" as the Trade Dresses. *Leatherman*, 199 F.3d at 1013-14. Corser compared the Trade Dresses to the shelters manufactured by Plaintiff's self-identified competitors and determined that these shelters did not provide the same advantages. Corser Report ¶¶ 188-201. The competitors' shelters are not octagon-shaped, and Corser provided analysis showing that the Trade Dresses has advantages over these shelters by virtue of their octagonal shape. For example, a competitor's circular shelter has an advantage in square footage over the Trade Dresses. *Id.* ¶ 200. However, unlike the Trade Dresses, the circular shelter cannot accommodate double doors or large windows because it must be constructed with closely spaced vertical supports. *Id.* ¶ 198. This is of critical importance because in emergency medical settings, "the use of wide or double doors is needed to facilitate" in "emergency medical settings." *Id.* ¶ 108. Corser observed that another competitor's shelter is rapidly deployable, but its arched roof reduces the available floor space compared to the Trade Dresses' vertical walls. *Id.* ¶ 191. Thus, in looking at the possible competitors, none of them offer the same functionality as the Trade Dresses.

Plaintiff's expert, Joel Delman, supplies a list of rectangular, square, and domed shelters that he believed to be "reasonable alternatives" to the Trade Dresses. DX 11 ¶¶ 77-83, ECF No. 78-12 ("Delman Report"). Delman summarily concludes that these alternatives provide the same advantages as the Trade Dresses because they "work equally as well to keep people enclosed and out of external weather elements." *Id.* ¶ 113. However, Delman's conclusion rests on an improper and overly broad assessment of what qualifies as an alternative design. Whether an alternative design may substitute for a product depends on the alternative design's *features* and the possibility that a customer may seek out those features. *Leatherman*, 199 F.3d at 1014 (rejecting the contention that courts should look to "broadly defined product lines" when examining alternatives); *see also Tie Tech*, 296 F.3d at 786 (holding that plaintiff's web cutter was deemed functional despite the fact that other web cutters might be effective at cutting web because the alternative did not offer a secure grip handle that provided an ease of use).

In addition, the analysis in the Delman Report is conclusory. Beyond quoting the shelter manufacturers' product descriptions, Delman does not explain how he identified the purported alternatives or what features they have. Delman Report ¶¶ 77-83; DX 6 163:18-166:8, 173:19-174:10, ECF No. 78-7. Nor does he provide any analyses of the functional benefits, *e.g.*, their square footage, assembly method, weight, or structural stability, that may affect a customer's decision-making process. Thus, Delman's report offers no basis for a fact finder to assess whether the competitors' shelters provide the same features as the Trade Dresses. *See Cont'l Lab'y Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1015 (S.D. Cal. 2000) (granting summary judgment where plaintiff's expert affidavit did not discuss alternative products' features); *Cal. Pac. Labs. v. Nalge Nunc Int'l Corp.*, No. 02-cv-01418, 2003 WL 24027885, at *4 (C.D. Cal. Dec. 4., 2003) (finding evidence insufficient where expert provides alternate designs but does not state whether these designs provide the same advantages).

The Delman Report also fails to provide sufficient information about whether the alternative designs are commercially viable. In order to be considered an alternative design, the design must be commercially viable and available. *Disc Golf*, 158 F.3d at 1008-09 (finding that party did not offer sufficient evidence supporting inference of alternative designs' commercial

viability). Delman did not provide any sales data, market share, or other information demonstrating these shelters' commercial success. A reasonable fact finder would not have sufficient information from Delman's analysis to assess whether these alternatives are commercially viable alternatives to the Trade Dresses. *Cont'l Lab'y Prods.*, 114 F. Supp. 2d at 1015 (finding expert opinion to be inadequate when expert did not provide sales data or market share). The Delman Report thus does not provide evidence of alternative designs that may compete with the Trade Dresses.

Finally, both Plaintiff's experts propose theoretical shelter designs that would not infringe on the Trade Dresses. Burleson proposes that a non-octagonal shelter would still able to withstand wind load from a jet, and also have usable interior space, structural stability, and modularity. Burleson Report ¶¶ 55, 56. Delman also proposed a hypothetical eight-sided shelter with a flat roof, which would not infringe the Trade Dresses. Delman Report ¶¶ 84-85. These theoretical designs are deficient. Neither expert analyze how these theoretical designs would provide the same utilitarian advantages or explain how commercially feasible it would be to launch these hypothetical shelters as products. This is insufficient to create a genuine issue of fact. *See Atlas Equip. Co. v. Weir Supply Grp., Inc.*, No. 07-cv-01358, 2009 WL 4670154, at *11 (W.D. Wash. Sep. 15, 2009) (finding "theoretical alternatives" to be "insufficient to create a triable issue of fact"), *aff'd sub nom., Atlas Equip. Co. LLC v. Weir Mins. Austl. Ltd.*, No. 09-36151, 2011 WL 52455 (9th Cir. Jan. 6, 2011); *Cont'l Lab'y Prods*, 114 F. Supp. 2d at 1015-16 (finding that nonmoving party provided no evidence as to alternative designs in part because that expert did not analyze hypothetical alternatives' purpose or use).[15]

---

[15] Plaintiff attempts to rely on *Dogloo, Inc. v. Dokskocil Mfg Co.*, 893 F. Supp. 911 (C.D. Cal. 1995), for the proposition that the "existence of actual or *potential alternative designs* that work equally well strongly suggests" that a design is non-functional. Pl. Opp. at 8-9. This is an accurate statement of the law, but unlike in *Dogloo*, Plaintiff's experts fail to provide analysis demonstrating that the hypothetical alternatives were "equally functional" or that they could be "as easily and cheaply manufactured as plaintiff's product." *Dogloo*, 893 F. Supp. at 919 (citation omitted).

In sum, Plaintiffs have failed to offer any evidence showing how these alternative designs (whether theoretical or actual) provide the same features or functional advantages as the Trade Dresses or whether they would be competitive and commercially viable. Accordingly, this factor weighs in favor of a finding of functionality.

**iii. Advertising of utilitarian advantages**

Defendants argue that the third *Disc Golf* factor supports a finding of functionality because both Western Shelter and Design Shelter advertised the Trade Dresses' utilitarian advantages. Defs. MSJ at 19-20. "If a seller advertises the utilitarian advantages of a particular feature, [it] constitutes strong evidence of functionality." McCarthy on Trademarks and Unfair Competition § 7:74 (5th ed. 2025); *see also Secalt*, 668 F.3d at 686; *Talking Rain Beverage Co. v. S. Beach Beverage Co.*, 349 F.3d 601, 603-04 (9th Cir. 2003) (functionality finding supported by advertisement connecting bottle design and ease of use); *Century Int'l Arms Inc. v. XTech Tactical LLC,* No. 18-cv-03404, 2020 WL 6526205, at *4 (D. Ariz. Nov. 5, 2020).

Defendants submitted evidence that both Design Shelter and Western Shelter advertised the Trade Dresses' utilitarian advantages beginning in 2001.[16] In support of the Trade Dresses being designed for utilitarian advantage, Defendants submitted Design Shelter's advertising dating back to 2001, where Design Shelter explained that its Habitat and Long Habitat shelters had "superior structural integrity and maximum resistance to high wind conditions" because of their "octagonal and oval shapes." DX 32, ECF No. 78-33. Defendants also submitted Western Shelter's website from 2001, which advertised that Western Shelter's design was based on the "octagon shape which inherently delivers far more structural integrity than a square or rectangular

[16] Plaintiff asserts that Defendants' evidence of advertising prior to the alleged infringement in September 2023 should not be considered, because "functionality is judged 'at the time of the alleged infringement.'" Pl. Opp. at 13 (quoting *Secalt*, 668 F.3d at 685). But this proposition does not render pre-infringement advertising irrelevant to assessing functionality. Although a functional feature or "configuration" of features "may later change to become non-functional," Plaintiff does not contend this has occurred here. *Adidas-Salomon AG v. Target Corp.*, 228 F. Supp. 2d 1192, 1205 (D. Or. 2002) (citation omitted). Nor is it disputed that the Trade Dresses' basic shape and design have not changed since 1988, DF 7, and the Forest Service as recently as September 2023 was seeking tents that had the Trade Dresses' characteristics, DAF 21.

structure." DX 14 at 2, ECF No. 78-15.[17]

Defendants also submitted evidence that Western Shelter continued to advertise the Trade Dresses' utilitarian advantages for years afterward. For example, Western Shelter sent advertisements to customers in 2012 and 2022 describing the designs' structural integrity and connectability. DX 18 at WSA_044643, ECF No. 78-19 ("The Western Shelter design is based on the geometry of the octagon shape, which inherently delivers more structural integrity than a conventional square or rectangular structure."); DX 20 at WSA_028734 ("Because of our unique octagon shape and modular components, [v]estibules can connect shelters front, back, off the ends, or off the 45-degree corners."). Western Shelter's advertising also emphasized that the Trade Dresses' vertical sidewalls maximized floorspace. DX 15 at CORSER_003705, ECF No. 78-16 (stating that GK20's "[v]ertical 6 ft. sidewalls maximize usable square footage"); DX 16 at CORSER_003707, ECF No. 78-17 (stating the same as to GK1935). Plaintiff's prior advertising also stated that the Trade Dresses' "double wide doors can accommodate equipment and gurneys." DX 20 at WSA_028727, ECF No. 78-21; *see also* DX 19 at WSA_048544, WSA_048546 ("Rigid frame double door gives a large entryway with a door ramp that easily accommodates gurneys and/or wheelchairs.").

In sum, Western Shelter's advertising emphasized that elements of the Trade Dresses conferred utilitarian advantages, and those utilitarian advantages were reasons to buy their products. Plaintiff offers no recent advertising or evidence indicating that the Trade Dresses' elements are no longer considered utilitarian. This factor also weighs in favor of functionality.

---

[17] Plaintiff objects to Defendants' Exhibits 14, 17, 21, 32, 33, and 34 – which were obtained through the Internet Archive's Wayback Machine – for lack of foundation under Federal Rules of Evidence 901 and 902, and as inadmissible hearsay under Rules 801 and 802. Pl. Opp. at 27-28. At summary judgment, evidence may be considered so long as its contents are admissible. *Fraser*, 342 F.3d at 1036. In addition, because these exhibits were "automatically computer-generated without human input or review," they are not a statement by a person and are not subject to the hearsay rule. *Hansen Cold Storage Constr. v. Cold Sys., Inc.*, No. 19-cv-07617, 2021 WL 6536672, at *3 (C.D. Cal. Dec. 19, 2021) (first quoting *United States v. Gonzales*, 615 F. App'x 405 (9th Cir. 2015); and then citing *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015)). Plaintiff's objections are overruled.

**iv. Economies of manufacture**

A finding of functionality is supported by the design being comparatively simple or inexpensive to manufacture. *Disc Golf*, 158 F.3d at 1009. The parties acknowledge that there is limited evidence on this factor. 4/9/2026 H'rg Tr. 23:13-24:1; 40:7-22, ECF No. 94. This factor is neutral as to functionality.

* * *

Assessing the record and the *Disc Golf* factors, the Court finds that Defendants have submitted substantial and unrebutted evidence for three of the four *Disc Golf* factors. First, Defendants have submitted evidence that the Trade Dresses' elements have utilitarian advantages, and Plaintiff has not submitted evidence showing that those elements were designed to be ornamental or source-identifying. Second, Defendants provide evidence that while alternative designs are available, the Trade Dresses provide specific advantages that may be desired by consumers. The alternative designs identified by Plaintiff do not create a genuine dispute of material fact because those designs do not offer the same advantages as the Trade Dresses, and there is no evidence that they are commercially viable. Third, Defendants have identified older and more recent advertising by Plaintiff emphasizing the Trade Dresses' utilitarian advantages. The fourth *Disc Golf* factor, economy of manufacture, is neutral.

Because the undisputed facts establish that the Trade Dresses are functional, and Plaintiffs offer no facts or evidence to the contrary, the Court finds that Defendants have overcome the presumption of validity and functionality may be determined as a matter of law.[18] *Tie Tech*, 296 F.3d at 784. The Court finds that the Trade Dresses are functional, and therefore cancellation of their registrations is warranted. Accordingly, the Court grants summary judgment to Defendants on their counterclaim for cancellation on the basis of functionality.

---

[18] Defendants also seek summary judgment as to Plaintiff's claims for trademark infringement and unfair competition under the Lanham Act, unfair competition under Oregon common law, and violations of the UTPA, because there is no likelihood of confusion between Plaintiff and Defendants' products. In light of the Court's conclusion that the Trade Dresses are functional, the Court does not need to reach the likelihood of confusion.

United States District Court
Northern District of California

**2. Plaintiff's Lanham Act Claims**

Because the undisputed facts establish that the Trade Dresses are functional, Defendants are also entitled to summary judgment on Plaintiff's trademark infringement and unfair competition claims under the Lanham Act. Because the Trade Dresses are functional, the Trade Dresses are ineligible for trademark protection and Plaintiff's trademark infringement and unfair competition by false designation claims cannot proceed. *See Talking Rain*, 349 F.3d at 602, 605 (affirming finding of functionality, grant of counterclaim for cancellation, and grant of summary judgment as to plaintiff's claims of trademark infringement and false designation). Thus, the Court grants summary judgment to Defendants as to Plaintiff's Lanham Act claims.

**3. Plaintiff's Remaining State Law Claims**

Defendants request that the Court also dismiss with prejudice the following claims by Plaintiff: (1) unfair competition under Oregon common law; (2) violations of the UTPA; and (3) unjust enrichment. Defs. Notice of MSJ, ECF No. 78.

**a. Unfair competition under Oregon common law**

Defendants assert that Plaintiff's claim of unfair competition under Oregon common law should follow the corresponding claim under federal law. Defs. Suppl. Br. at 1-2. Oregon courts generally follow federal law in determining whether a trade dress has utilitarian functionality. *Deckers Outdoor Corp. v. Pac. Harbors, LLC*, No. 19-cv-01587, 2020 WL 5269437, at *3 (D. Or. Aug. 10, 2020) (considering functionality simultaneously for Oregon common law unfair competition claim, federal trademark infringement claim, and federal unfair competition claims), *report and recommendation adopted*, No. 19-cv-01587, 2020 WL 5260379 (D. Or. Sep. 3, 2020); *Adidas-Salomon*, 228 F. Supp. 2d at 1197, 1200 (conducting same functionality analysis for federal trademark infringement and unfair competition claims and state unfair competition claims).

Plaintiff states that Oregon law "afford[s] a broader degree of protection to unfair competition claims involving trade dress" than federal law. Pl. Suppl. Br. at. 4. But Plaintiff has not identified, and the Court has not located, any precedent suggesting that a design may be found functional under federal law but non-functional under state law. Moreover, such a finding would run contrary to the principle that functional product designs should be protected through patent

law, not trademark law.[19] *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 165 (1989) ("It is well established . . . that [a] [state] action for unfair competition cannot be based upon a functional design." (quoting *Power Controls Corp. v. Hybrinetics, Inc.*, 608 F.2d 234, 240 (Fed. Cir. 1986)).

Plaintiff also asserts that Oregon courts have recognized a "broader range of inquiry" for unfair competition claims under Oregon common law compared to the Lanham Act. Pl. Suppl. Br. at 2. This is not accurate. The two cases that Plaintiff cite in support of this assertion state that claims of unfair competition may be broader than claims for *trademark infringement*. *Adidas-Salomon*, 228 F. Supp. 2d. at 1201 (discussing only federal claims of trademark infringement and unfair competition); *Decker Outdoor*, 2020 WL 5269437, at *3 (discussing both federal and state law claims of unfair competition and trademark infringement). Moreover, the "broader range of inquiry" is in reference to the likelihood of confusion prong of the infringement test. *Adidas-Salomon*, 228 F. Supp. 2d. at 1201. Because the Court did not need to reach the likelihood of confusion between the parties' products, the Court need not reach this broader inquiry by Oregon courts.

Thus, because the Court granted Defendants' motion for summary judgment on the cancellation counterclaim, Plaintiff's unfair competition claim under Oregon common law can no longer survive. The Court grants summary judgment to Defendants as to Plaintiff's common law unfair competition claim.

**b. Violations of Oregon's UTPA**

Plaintiff also brings a claim for violations of the UTPA, specifically Or. Rev. Stat. § 646.608(1)(a)-(c). Compl. ¶¶ 116-23. In its supplemental brief, Plaintiff agreed to withdraw its UTPA claim. Pl. Suppl. Br. at 2; *see also State ex rel. Rosenblum v. Living Essentials, LLC*, 371 Or. 23, 39 (Or. 2023) (describing UTPA as "a comprehensive statute that protects *consumers* from

---

[19] Plaintiff cites to an Oregon appellate court decision in support of the proposition that a mark may be considered "generic" under federal law but still protectable under Oregon common law. Pl. Suppl. Br. at 4 (citing *Classic Instruments, Inc. v. VDO-Argo Instruments, Inc.*, 73 Or. App. 732, 740 (Or. Ct. App. 1985)). However, *Classic Instruments* only focused on *genericness* – which goes to distinctiveness – not functionality.

unlawful trade practices."). The Court grants summary judgment to Defendants as to Plaintiff's UTPA claim.

**c. Unjust enrichment**

Plaintiff asserts that Defendants were unjustly enriched through their misappropriation of the Trade Dresses' unique features. Compl. ¶¶ 124-28. As surfaced during the supplemental briefing, the parties dispute whether Oregon or California law governs this claim. Defs. Suppl. Br. at 4-6; Pl. Suppl. Br. at 4-5.

Regardless of which state's law applies, Plaintiff cannot proceed on this claim because there is no genuine issue of material fact as to whether Defendants unjustly retained a benefit through infringement or any other wrongful conduct. To succeed on a claim of unjust enrichment under California law, a plaintiff must demonstrate that the defendant "received and unjustly retained a benefit at [plaintiff's] expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016); *see also Myers-Armstrong v. Actavis Totowa, LLC*, 382 F. App'x 545, 548 (9th Cir. 2010) (under California law, unjust enrichment is not a cause of action *per se*, but rather "a basis for obtaining restitution based on quasi-contract or imposition of a constructive trust." (quoting *McKell v. Wash. Mutual, Inc.*, 142 Cal. App. 4th 1457, 1490 (2006))). Similarly, an unjust enrichment claim under Oregon law requires that the defendant must have been in "receipt of a benefit." Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011); *see also AssuredPartners of Or., LLC v. Reese*, No. 22-cv-00673, 2022 WL 18024957, at *5 (D. Or. Dec. 30, 2022) ("[T]he Restatement (Third) of Restitution and Unjust Enrichment (2011) is a proper authority to reference when considering whether allegations of unjust enrichment fall within an 'established category.'" (citing *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 131 (Or. 2017))).

Because the Trade Dresses are not eligible for trademark protection, Defendants could not have misappropriated or infringed on the Trade Dresses. Nor has Plaintiff demonstrated any other wrongful conduct that conferred an "unjust benefit." Thus, whether under California or Oregon law, Plaintiff's unjust enrichment claim fails. The Court grants summary judgment to Defendants as to Plaintiff's unjust enrichment claim.

United States District Court
Northern District of California

### C. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment as to its claims for trademark infringement and unfair competition by false designation of origin under the Lanham Act. Having granted summary judgment to Defendants on their counterclaim for trademark cancellation on the basis of functionality, the Court denies Plaintiff's motion for summary judgment on Plaintiff's claims for trademark infringement and unfair competition under the Lanham Act. The Court also denies Plaintiff's requests for damages, attorneys' fees, and injunctive relief.

## III. MOTIONS TO EXCLUDE

Finally, the Court considers the parties' *Daubert* motions, granting in part Plaintiff's motion to exclude the expert testimony of Robert Corser and terminating as moot the motion to exclude the expert testimony of Joel Delman.[20]

Federal Rule of Evidence 702 requires courts to ensure that expert testimony is both relevant and reliable. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025). Courts act as gatekeepers of expert opinion testimony. They "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The proponent of the expert's testimony must demonstrate to the court by a preponderance of the evidence that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

The jury, not the court, makes determinations as to credibility. *Engilis*, 151 F.4th at 1049-50. Thus, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citation

[20] The Court did not consider the excluded portions of the Corser Report in ruling on the parties' motions for summary judgment.

United States District Court
Northern District of California

modified). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.*

### A. Plaintiff's Motion to Exclude Corser

Plaintiff seeks to exclude the Corser Report for four primary reasons: (1) Corser does not have the appropriate "scientific, technical, or other specialized knowledge" to render an expert opinion on industrial design; (2) Corser improperly considered aspects of the Trade Dresses that were not part of their respective definitions; (3) Corser provided a legal opinion; and (4) Corser employed improper methodologies to analyze the *Disc Golf* factors. Corser Mot. at 1. The Court considers each of these reasons below.[21]

#### 1. Corser's Qualifications

Plaintiff asserts that because Corser is an architect and not an industrial designer, he is unequipped to discuss shelters. Corser Mot. at 4. Federal Rule of Evidence 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Rule 702 "contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (quoting *Thomas v. Newton Int'l Enters*., 42 F.3d 1266, 1269 (9th Cir. 1994)). Corser is a licensed architect with a master's degree from Harvard University's Graduate School of Design with a focus on computer applications in structural and architectural design. Corser Report ¶ 11. The Court finds that Corser has sufficient knowledge, skill, and experience to give expert testimony as to shelters.

#### 2. Definitions of the Trade Dresses

Plaintiff argues that the Corser Report is based on a "flawed definition of Plaintiff's trade dress." Corser Mot. at 6. Plaintiff contends that Corser improperly treated the trademark registrations' "description of goods" – specifically "interoperability" and "use environment" in

---

[21] Plaintiff additionally seeks to exclude the Corser Report because of alleged discrepancies between the Corser Report and a 2008 research paper on shelters authored by Corser. Corser Mot. at 9. If there is any contradiction between the Corser Report and his 2008 paper, that issue goes to Corser's credibility, not his exclusion. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").

hazardous conditions – as "limit[ing]" the scope of Plaintiff's Trade Dresses. Corser Mot. at 5-6. This is not accurate. Corser properly focused on the Trade Dresses' elements that were listed in their registrations. Corser Report ¶¶ 142, 143 (listing each element of the Trade Dresses); *see also id.* ¶¶ 18-19. Next, and as part of his analysis regarding the Trade Dresses' utilitarian advantages, Corser appropriately considered the products' purpose and uses when assessing the benefits of the Trade Dresses' elements. *Id.* ¶¶ 132-39 (describing the applications for use and purported advantages from Western Shelter's website), 187 (describing one functional benefit of the *octagonal* shape as interoperability). Corser did not rely on a flawed definition of Plaintiff's Trade Dresses or improperly consider elements or features that were not part of the Trade Dresses were not part of their respective definitions. The Court therefore declines to exclude the Corser Report on this basis.

**3. Legal Opinion**

Plaintiff argues that Corser's Report should be excluded as improper legal opinion. Corser Mot. at 10 (citing Corser Report at 2-3, 81-82). Expert testimony concerning an ultimate issue is not per se improper. *See Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002). Federal Rule of Evidence 704(a) provides that expert testimony that is otherwise admissible is "not objectionable just because it embraces an ultimate issue" to be decided by the trier of fact. However, "an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law." *Hangarter*, 373 F.3d at 1016 (quoting *Mukhtar*, 299 F.3d at 1066 n.10).

The Court finds that the Corser Report does not offer an opinion on an ultimate issue of law. Corser provides facts and analysis as to each *Disc Golf* factor, but does not provide a conclusion on each factor. *Id.* at 1017 ("[A] witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." (citation omitted)). He also does not provide a legal conclusion as to whether the Trade Dresses have utilitarian functionality based on all *Disc Golf* factors. The Court finds that Corser's analysis provides "relevant opinions and conclusions." *Hyer v. City and Cnty. of Honolulu*, 118 F.4th 1044, 1059 (9th Cir. 2024) (citation omitted). Even if Corser had offered a legal

opinion in his report, exclusion of his report altogether would not be appropriate; rather, Corser should be permitted to testify so long as he does not "veer[] into improper legal opinions.'" *Id.* Thus, the Court declines to exclude the Corser Report on this basis.

**4. Methodologies for *Disc Golf* Factors**

Plaintiff takes issue with Corser's methodology in evaluating the *Disc Golf* factors. Corser Mot. at 7-9. At the outset, Plaintiff asserts that Corser's functionality inquiry failed to "focus on trade dress 'as a whole'" and that this "alone is [a] sufficient reason to exclude his testimony." Corser Mot. at 7. The Court disagrees that Corser neglected to consider the trade dress as a whole. Corser Report ¶ 4 ("I have analyzed the overall appearance of the GK20 Mark and the GK1935 Mark, including the embodiment of those marks[.]"). Plaintiff is correct that "the proper inquiry" "is not whether individual features of a product are functional[,] . . . but whether the whole collection of features taken together are functional." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1050 (9th Cir. 1998) (citation omitted). "However, in *conducting* that inquiry, an expert may examine the individual features of the trade dress." *Buzzballz, LLC v. MPL Brands NV, Inc.*, No. 24-cv-04004, 2026 WL 1388946, at *3 (N.D. Cal. May 18, 2026); *Blumenthal*, 963 F.3d at 866 ("Examining a product 'as a whole' does not require any strained effort to look at its gestalt without seeing its individual features."). Indeed, "when the claimed trade dress is an 'overall appearance'" – as it is here – it is important to consider whether the trade dress is merely an "assemblage of functional parts." *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1213 (9th Cir. 2023) (citing *Blumenthal*, 963 F.3d at 866). "Therefore, it is appropriate for an expert witness to examine the individual features of an asserted trade dress *in aid of* analyzing whether the 'overall appearance' is functional or nondistinctive." *Buzzballz*, 2026 WL 1388946, at *3.

The Court next considers Plaintiff's objections as to each *Disc Golf* factor.[22]

[22] Plaintiff requests that Corser's analysis of advertising prior to 2023 be excluded because it is "not relevant to determining the functionality of" the Trade Dresses at the time of the alleged infringement. Corser Mot. at 8. However, as discussed above, the pre-2023 advertising is relevant to the functionality analysis. *See supra* Section III.B.2.a.iii. Thus, the Court finds no reason to exclude this part of the Corser Report.

United States District Court
Northern District of California

**a. Utilitarian advantages**

Plaintiff objects to Corser's "material spatial efficiency" analysis and his structural stability analysis. Corser Report ¶¶ 151-187; Corser Mot. at 7 (describing them as "surface area analyses and wind force examinations"). Plaintiff asserts that Corser's "tests" are not "generally accepted methods for examining the utilitarian advantage of an industrial design." Corser Mot. at 7-8. Plaintiff does not provide any legal support for this conclusory assertion.[23]

Under Rule 702, expert testimony must be both relevant and reliable to be admissible. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-92 (1993). Corser explained that he considered the various shapes' spatial and material efficiency, *i.e.*, the amount of exterior surface area needed to enclose a certain floor area. Corser Report ¶¶ 152, 154, 157. Corser observed that spatial and material efficiency is relevant to utilitarian performance because it impacts a shelter's weight, cost, and heat retention capabilities. *Id.* ¶ 151. To calculate spatial efficiency, Corser considered four different tent shapes; each shape was assumed to have the same amount of floor area, side wall height, and roof height. *Id.* ¶¶ 152, 157. If a shape needed more exterior surface area for the same amount of enclosed space, Corser considered the shape less effective. *Id.* ¶¶ 151-158. His methodology was disclosed and replicable.

Corser also compared the structural stability of the Trade Dresses against other possible shelter shapes. *Id.* ¶ 161. Noting that the Trade Dresses are intended for use in emergency situations, Corser "prepared a simple structural stability comparison of an octagon-based tent versus square tent," to evaluate their stability performance in high wind conditions. Corser used a

[23] Plaintiff also seeks to exclude Corser's opinion that relies on third-party utility patents because the patents "have no bearing on the functionality of Plaintiff's trade dress" and should be excluded as irrelevant. Pl. Opp. at 7-8. The Court declines to do so. The Supreme Court has explained that a utility patent may offer "strong evidence that the features therein claimed are functional." *TrafFix*, 532 U.S. at 29.

Determining whether the essential feature of a trade dress is the same as the "central advance claimed" in an expired utility patent is a question of fact. *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 497 (7th Cir. 2019). The utility patents cited by Corser include features also found in the Trade Dresses. Thus, the utility patents are relevant data that Corser may rely on, and a jury can consider the weight to give those utility patents. *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, No. 18 -cv-05290, 2023 WL 6614486, at *39-40 (S.D.N.Y. Sep. 20, 2023) (ruling that Joel Delman may be cross-examined on his opinion relating to utility patents).

United States District Court
Northern District of California

computational fluid dynamics model ("CFD") to simulate high wind conditions and then compared each shape's wind resistance. *Id.* ¶¶ 161-181. The Court finds that CFD is a sufficiently reliable method to measure structural stability. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1343-44 (11th Cir. 2003) (noting that CFD is a well-known discipline that has been "critically evaluated in peer-reviewed articles and studies" and that its uses and benefits have been recognized by "courts and scholarly commentators alike"); *see also Buckley v. Airshield Corp.*, 116 F. Supp. 2d 658, 661 (D. Md. 2000). The Court concludes that Corser's analyses would help a jury determine whether the Trade Dresses' octagonal shape provides utilitarian advantages over other shelter shapes.

**b. Alternative designs**

Plaintiff objects to Corser's methodology for assessing alternative designs. Corser Mot. at 8. In his assessment, Corser began with shelters manufactured by Plaintiff's self-identified competitors. Corser Report ¶ 188. To evaluate these alternative designs, Corser considered five factors: (1) spatial efficiency; (2) structural integrity; (3) material efficiency; (4) ease of manufacture, and (5) ease of assembly. Corser PX C 180:21-181:8. Plaintiff argues that Corser "refused to consider alternative tent designs that perform the basic function of keeping people sheltered as true alternatives." Corser Mot. at 8.

Not only is there no legal support for the critique, but this critique is also premised on a legally flawed understanding of what qualifies as an alternative design. The Ninth Circuit specifically rejected the notion that "a product feature is nonfunctional if there is *any* alternative design that competes to *any* degree." 199 F.3d at 1014 & n.7 ("[Plaintiff] does not have rights under trade dress law to compel its competitors to resort to alternative designs which have a different set of advantages and disadvantages. Such is the realm of patent law.").

The Court finds Corser's analysis of alternative designs is admissible, with the exception of any opinion involving the ease of manufacture.[24] Corser reasonably invokes these factors

[24] *See supra* Section II.B.1.b.v (discussing the fourth *Disc Golf* factor). In determining that the Trade Dresses are functional and therefore unprotectable under trademark law, the Court did not consider Corser's opinion on ease of manufacture, whether as part of his analysis under the second

United States District Court
Northern District of California

because in his expertise, customers consider these factors while making purchasing decisions. Corser PX C 179:18-180:8. Thus, Corser's comparison of the Trade Dresses and alternative designs, using these factors as metrics, can assist a factfinder in determining whether the alternative designs offer the same features as the Trade Dresses. The Court finds that Corser's testimony appears to be based on sufficient facts and reliable principles, and would assist a jury.

**c. Economies of manufacture**

Plaintiff seeks to exclude Corser's testimony as to the fourth *Disc Golf* factor – the ease of manufacture. Corser Mot. at 9. During his deposition, Corser admitted that he does not have experience with the cost of manufacturing these products. Thus, the Court EXCLUDES Corser's testimony as to factor four of *the Disc Golf* test because his opinion is not based on "reliable facts or data." Fed. R. Evid. 702(b).

* * *

In sum, the Court GRANTS Plaintiff's motion to exclude in part. The Court declined to consider the portions of the Corser Report that reflects his opinion on manufacturing shelters. Otherwise, Plaintiff's motion to exclude the Corser Report is DENIED.

**B. Defendants' Motion to Exclude Delman**

Defendants seek to exclude Delman's testimony for two reasons: (1) he offered affirmative opinions in a rebuttal report, so that his opinion was not timely disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2)(B); and (2) his opinions are not reliable or relevant, and therefore are inadmissible pursuant to Federal Rule of Evidence 702.

The Court does not need to reach whether the Delman Report and his testimony are proper under Federal Rule of Civil Procedure 26(a)(2)(B) or Federal Rule of Evidence 702. The Delman Report raises concerns under both rules, including whether it truly is a rebuttal report as opposed to an untimely affirmative opinion, and whether Delman's methodology is sufficiently rigorous. But as discussed above, even assuming that the Delman Report is not excluded, Defendants have established that there is no genuine dispute as to their counterclaim of cancellation for

---

*Disc Golf* factor (alternate designs) or fourth *Disc Golf* factor (ease of manufacture).

functionality. The Court TERMINATES as moot the motion to exclude the Delman Report.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1) Defendants' motion for summary judgment as to their counterclaim for cancellation of the Trade Dresses' registrations due to alleged fraud on the USPTO is DENIED.

2) Defendants' motion for summary judgment as to their counterclaim for cancellation of the Trade Dresses' registrations for functionality is GRANTED.

3) Because Plaintiff's trademarks are cancelled for functionality, Defendants' motion for summary judgment as to all of Plaintiff's claims is GRANTED.

4) Plaintiff's motion for summary judgment as to its trademark infringement and unfair competition claims under the Lanham Act is DENIED.

5) Plaintiff's motion to exclude the expert testimony of Robert Corser is GRANTED IN PART as to the fourth *Disc Golf* factor and the ease of manufacture, and DENIED as to his remaining testimony.

6) Defendants' motion to exclude the expert testimony of Joel Delman is TERMINATED as moot.

7) Trademark Registrations Nos. 6,270,901 and 6,270,092 are to be cancelled for functionality, pursuant to 15 U.S.C. § 1064.

8) All further deadlines in this case are VACATED.

9) All other pending motions are TERMINATED as moot.

**IT IS SO ORDERED.**

Dated: September 30, 2026



Eumi K. Lee
United States District Judge

United States District Court
Northern District of California